UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| SEL W. DUNLAP, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) CAUSE NO. 3:05-CV-214RM |
| | ) |
| REFUSE DEPARTMENT SANITARY | ) |
| DISTRICT, | ) |
| | ) |
| Defendant | ) |

OPINION AND ORDER

Sel Dunlap, without the benefit of counsel, sues his former employer, Refuse Department Sanitary District, alleging racial discrimination in violation of Title VII of the Civil Rights Act of 1964. The Sanitary District seeks summary judgment and, for the reasons that follow, the court grants the motion.

FACTS

The following facts are taken from the summary judgment record, and are viewed as favorably to Mr. Dunlap as is reasonable. The Sanitary District is a municipal department for the city of Michigan City. In January 2004 it created a new position for a "sanitation inspector." The position was advertised and several people applied, including Mr. Dunlap who is an African American man. Sanitary District superintendent Jim Kintzele and Michigan City Personnel Department Director Shelley Dunleavy interviewed Mr. Dunlap and he was eventually hired.

Mr. Dunlap claims that he and Mr. Kintzele have a so-called "friction" that stems from the denial of Community Development Corporation's bid on a cable television contract in the early 1980s. Community Development Corporation, a company comprised of 10-12 black individuals and supported by Mr. Dunlap, was among 4 bidders to provide cable television for Michigan City. The Michigan City Board of Works considered each proposal and recommended to the Michigan City City Council that it select Cox Cable—then the fourth largest cable provider— over Community Development Corporation, and the Council accepted the recommendation. Although Mr. Kintzele served on the Council for 16 years, he maintains he wasn't on it when the cable television vote took place. Mr. Dunlap says Mr. Kintzele was on the Council during the cable television hearings and that his "vicious" behavior during those hearings demonstrates his bigoted opposition to African Americans.

When he was interviewed, Mr. Dunlap was aware that Mr. Kintzele would be his immediate supervisor, but didn't express any problems or concerns about working at the Sanitary District. He later testified that he had some reservations about specifically working for Mr. Kintzele. Still, he accepted the job and began work on January 27, 2004. Being a new employee meant Mr. Dunlap had to serve a mandatory probation period of 90 days and had to complete daily activity reports. The Sanitary District says these daily reports were required so that Mr. Kintzele could evaluate the new position and Mr. Dunlap's initial performance. Mr.

Dunlap says he is unaware of any other city government employee who was required to submit daily activity reports.

As a sanitation inspector, Mr. Dunlap's written job description required him to "inspect [ ] community land areas and investigate [ ] complaints concerning neglect of property and illegal dumping of refuse and building materials to ensure compliance with municipal code."[1] His job had no supervisory responsibilities and he reported directly to Mr. Kintzele. Mr. Dunlap was provided a copy of the job description during his interview.

During Mr. Dunlap's first few days on the job he spoke with Mr. Kintzele about his job description and was given a copy of the employee handbook. He also spent time reading refuse literature and introducing himself to city officials. Sometime during Mr. Dunlap's first few weeks, he had a meeting with Mr. Kintzele who informed Mr. Dunlap that he was to "just clean the alleys." Mr. Kintzele notified Ms. Dunleavy on February 18 that the personnel department records should be changed from "sanitation inspector" to "refuse inspector" so to

---

[1] Mr. Dunlap had the following enumerated duties: (1) inspect designated areas periodically for evidence of neglect, excessive litter, and the presence of unsightly or hazardous refuse; (2) interview residents and inspect areas to investigate reports of illegal dumping and neglected property; (3) locate property owners to explain the nature of the inspection and investigative findings and to encourage voluntary action to resolve problems; (4) review the municipal code to determine the specific nature of a code violation and the type of action to be taken; (5) issue violations to land owners who didn't comply with a request for voluntary correction; (6) issue notices of abatement to known violators of dumping regulations and inform other municipal agencies of the need to post signs forbidding illegal dumping at designated sites; (7) work with police, code inspectors, and vector control personnel to identify and correct violations; (8) prepare case materials when legal action is required to solve problems; and (9) work with neighborhood planners and code inspectors to promote public awareness by conducting informational meetings for residents, organize neighborhood cleanup projects, participate in campaigns to beautify the city, and promote community interest in eliminating dangerous and unsightly land use practices.

3

accurately reflect the title of Mr. Dunlap's position. Mr. Kintzele states in his affidavit that the change in Mr. Dunlap's job title didn't change his job description or responsibilities. The Sanitary District says Mr. Dunlap's job duties were never changed, but doesn't point to any evidence that refutes Mr. Dunlap's claim that Mr. Kintzele told him to "just clean the alleys."

One of Mr. Dunlap's first initiatives as a refuse inspector was to contact the manager at Ace Hardware about a program to provide discounted trash cans. When Mr. Kintzele learned that Mr. Dunlap had acted without his permission, he told Mr. Dunlap that he didn't have the authority to initiate such programs. Mr. Dunlap also spent his time making announcements for a spring clean-up project.

Mr. Dunlap did not report to work or call-in on February 16. The Sanitary District's policies require employees to notify their department at least 1 hour before their starting time if they will be late or absent from work. Mr. Dunlap was given a written warning for failing to report to work. The next day, he sent a memorandum to Al Walus, the Sanitary District General Manager, complaining that Mr. Kentzele "lacked clarity [ ] as to how [Mr. Dunlap was] to carry out [his] assignments," "ha[d] assumed a totally irrational position regarding [Mr. Dunlap's] zeal," and "[had] made a radical move by changing [his] title to 'Refuse Inspector'." Per Mr. Dunlap's request, he met with Mr. Walus, Mr Kintzele, and the Sanitary District's business manager Doretha Sanders to discuss his job description and the Sanitary District's expectations of him. Mr. Dunlap didn't complain of racial discrimination at this meeting.

4

Two days later, Mr. Dunlap took a week's leave of absence due to a death in the family. Two days after returning, he was hurt on the job when he fell walking up a staircase. Mr. Kintzele told Mr. Dunlap that if he was still having pain the next day to notify him. Mr. Dunlap reported additional pain and went to a medical clinic. He remained off work with the injury for a month. Upon returning to work, Mr. Kintzele informed Mr. Dunlap that due to his absences, his probationary period needed to be extended so that Mr. Kintzele could effectively evaluate Mr. Dunlap's performance. Two weeks later, Mr. Dunlap again requested several days off to attend his sister's memorial service.

Mr. Dunlap requested a digital camera to take photographs of refuse. Mr. Kintzele authorized the purchase of a camera that was assigned exclusively to Mr. Dunlap and was to be used for work purposes only. For security reasons, Mr. Kintzele instructed Mr. Dunlap to keep the camera locked in his desk drawer and to not take the camera home. But on at least 3 separate occasions Mr. Kintzele discovered that Mr. Dunlap hadn't followed his instructions regarding the camera: on April 15 Mr. Dunlap took the camera home over-night and received a written warning; on May 11 he again took the camera home overnight and received a second written warning; and on May 18 he left the camera in a Sanitary Department truck, but no written violation was given. After learning of these incidents, Mr. Kintzele began checking Mr. Dunlap's desk periodically, and on one occasion, when Mr. Dunlap had locked up the camera, he left a note for Mr. Kintzele which read "satisfied."

Mr. Dunlap's additional conflicts with Mr. Kintzele stemmed from Mr. Dunlap's belief that Mr. Kentzele didn't appreciate the relationship between recycling and solid waste, and that Mr. Dunlap felt Mr. Kintzele was often inconsistent in his instructions. As a result, Mr. Dunlap often attempted to tape-record their conversations, and while having a conversation with Mr. Walters about Mr. Kintzele's treatment of his employees, he responded "fuck the dumb shit."[2] Mr. Dunlap also left a tombstone, along with a packet of flower seed, on Mr. Kintzele's desk. Mr. Dunlap didn't leave a note or further explanation for leaving the tombstone at the time, but he now says he left the tombstone as a gift since he knew Mr. Kintzele was an antique collector. Mr. Dunlap also had conflicts with his co-workers—in May he tried to write up the Department Assistant Superintendent Randy Walters because he believed he heard Mr. Walters make a derogatory comment about a city councilman.

On May 26, the Sanitary District received a call from a resident who was upset about receiving a flyer that Mr. Dunlap had left on her door. Sanitary District employee Judy Wilson explained to the caller that the flyer was not a citation but an informational handout. The caller said she would like to speak to Mr. Dunlap, so Ms. Wilson left him a message. After Mr. Dunlap returned the call,

---

[2] The Sanitary District also claims Mr. Dunlap mocked Mr. Kintzele's instructions with regard to the requirement that Mr. Dunlap report his position while in the field via a radio. Although Mr. Dunlap admits he reported more often than other employees, his deposition testimony is that he didn't report his location at every house he passed. He maintains that any reporting was done per Mr. Kintzele's instructions. Aside from the parties' conflicting statements on the frequency of Mr. Dunlap's communications, nothing in the record suggests the additional communications were done in a jeering manner. Whether Mr. Dunlap mocked Mr. Kintzele's instructions isn't material issue of fact for trial.

6

he prepared a memorandum in which he quoted the resident as saying Ms. Wilson told her she could "ignore the flyer" and that Mr. Dunlap was "just killing time to make some money." When Superintendent Jim Elwell and Office Manger Monique Cook spoke with the resident regarding the incident, the resident explained that it was she, and not Ms. Wilson, who had said Mr. Dunlap was "just killing time." The resident further explained that Ms. Wilson was nice and had tried to calm her down, but Mr. Dunlap had still suggested that the resident call the Mayor's office to complain about Ms. Wilson.

Mr. Dunlap received a termination letter the next day at a meeting with Mr. Kintzele, Mr. Walus, and attorney Christopher Willoughby. The letter explained that he was being terminated based upon Section 1.02 of the Employee Handbook, which stated that a probationary employee could be terminated for "unsatisfactory work, absenteeism, inability to perform or adjust to work assigned, to employees, or to supervision." Mr. Dunlap refused to sign the letter, believing his termination to be unjustified.

After Mr. Dunlap was terminated, the Sanitary District hired Connie Adams to serve as the Refuse Inspector. Mr. Adams is an African American man and works under the same job description as Mr. Dunlap did and is required to complete daily activity reports.

DISCUSSION

Summary judgment is appropriate when "the pleadings, depositions, answers to the interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding whether a genuine issue of material fact exists, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). No genuine issue of material fact exists when a rational trier of fact could not find for the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party. Ritchie v. Glidden Co., 242 F.3d 713, 720 (7th Cir. 2001). "The mere existence of an alleged factual dispute will not defeat a summary judgment motion; instead, the non-movant must present definite, competent evidence in rebuttal." Butts v. Aurora Health Care, Inc., 387 F.3d 921, 924 (7th Cir. 2004). The party with the burden of proof on an issue must show that there is enough evidence to support a jury verdict in his favor. Lawrence v. Kenosha County, 391 F.3d 837, 842 (7th Cir. 2004); *see also* Johnson v. Cambridge Indus., Inc., 325 F.3d 892, 901 (7th Cir. 2003) ("summary judgment 'is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events") (quoting Schacht v. Wisconsin Dep't of Corr., 175 F.3d 497, 504 (7th Cir. 1999)).

Mr. Dunlap says the change in his job title, the diminishment of his job responsibilities, and his eventual termination were racially motivated. Because Mr.

Dunlap doesn't have sufficient evidence to support a finding of racial discrimination under the direct method, to survive summary judgment he must satisfy the McDonnell Douglas burden-shifting analysis. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 793 (1973).[3] Under this approach, Mr. Dunlap must first establish a *prima facie* case of discrimination, which then shifts the burden of proof to the Sanitary District to provide some legitimate, nondiscriminatory reason for the challenged employment decisions. Ajayi v. Aramark Business Services, Inc., 336 F.3d 520, 531 (7th Cir. 2003). If the Sanitary District does so, Mr. Dunlap retains the ultimate burden of showing that the proffered reasons are pretextual. Id.

---

[3] Direct evidence "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 616 (7th Cir. 2000). That Mr. Kintzele allegedly gave instructions that differed from Mr. Dunlap's written job description doesn't rise to this level, despite Mr. Dunlap's assertion that such behavior in of itself suggests race was the motivating factor in his alleged disparate treatment. Circumstantial evidence that "point[s] directly to a discriminatory reason for the employer's action" can provide a basis for drawing an inference of retaliation under the direct method. Adams v. Wal-Mart Stores, Inc., 324 F.3d 935, 939 (7th Cir. 2003). The only other evidence of discrimination to which Mr. Dunlap points is his own belief that he and Mr. Kintzele have a "friction" that dates back to the 1980s and a situation where the Michigan City City Council didn't select a particular bidder–which Mr. Dunlap supported–to provide cable to Michigan City. Mr. Dunlap says this bidder wasn't selected because of race but doesn't cite any competent evidence to support this argument. The Sanitary District maintains that race wasn't a factor and that Mr. Kintzele wasn't on the City Council at this time. Even if Mr. Dunlap could show at trial that Mr. Kintzele was part of a vote to not select a particular bidder, his belief that the vote was because of some prohibited animus is based on pure speculation. To then infer that Mr. Kintzele treated Mr. Dunlap differently 20 years later because of his race would require a trier of to make several tenuous inferences. It would ask the trier of fact to find that Mr. Dunlap's disparate treatment wasn't because of his questionable job performance during his probationary period, or his unreticent behavior—which he acknowledges during his testimony was one of the reasons he was treated different—but because of some perceived animosity which Mr. Kentzele harbors towards him. Such an inference is unreasonable and so doesn't support a finding that Mr. Dunlap wouldn't have been treated differently but for his race. Gleason v. Mesirow Fin. Inc., 118 F.3d 1134, 1139 (7th Cir. 1997) (at the summary judgment stage courts aren't required "to draw every conceivable inference from the record, [ ] only reasonable ones").

Mr. Dunlap can establish a prima facie case by showing (1) he is a member of a protected class; (2) he was meeting the Sanitary Districts's legitimate expectations; (3) he suffered an adverse employment action; and (4) the Sanitary District treated similarly situated employees outside of the protected class more favorably. Foster v. Arthur Andersen, LLP, 168 F.3d 1029, 1035 (7th Cir.1999). To establish the fourth element, Mr. Dunlap must identify an employee "that is similarly situated with respect to performance, qualifications, and conduct," [4] and show that the other employee "had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-618 (7th Cir. 2000). Mr. Dunlap hasn't done this.

Mr. Dunlap says he "know[s] of no other white employees who have been hired with written job descriptions that were change orally, without a subsequent written replacement." He also implies in his EEOC charge that he was subject to additional supervision and eventual termination because he was black. He doesn't, however, point to any competent evidence—depositions, answers to interrogatories, admissions on file, or affidavits—that supports these arguments. He hasn't identified another white employee who had the same or similar job, was subject to the same standards, was supervised by Mr. Kintzele, and had

---

[4] Courts look at whether the employees "(1) held the same job description, (2) were subject to the same standards, (3) were subordinate to the same supervisor, and (4) had comparable experience, education, and other qualifications." Brummett v. Sinclair Broad. Group, Inc., 414 F.3d 686, 692-693 (7th Cir. 2005).

comparable, experience, education, and other qualifications. He hasn't identified another white employee who was on probationary status and had been hired to fill a newly created position, but didn't have his job responsibilities altered and wasn't closely supervised during the probationary period. Mr. Dunlap hasn't established that any co-worker was similarly situated, let alone that a similarly-situated employee was treated more favorably than he was treated, so the Sanitary District is entitled to summary judgment on Mr. Dunlap's Title VII Claim. Peele v. Country Mut. Ins. Co., 288 F.3d 319, 331 (7th Cir. 2002).

Still, Mr. Dunlap says two questions of fact preclude summary judgment: (1) did Mr. Kintzele have the authority to modify Mr. Dunlap's job description and (2) for what purpose is the modified job description being used as a basis for his dismissal. The court agrees with the Sanitary District that Mr. Kintzele's authority to alter a subordinate's job description isn't material to whether Mr. Dunlap was discriminated against. The second purported question of material fact also doesn't preclude summary judgment.

Mr. Dunlap apparently argues his job performance was satisfactory under the original job description, so a genuine issue of fact precludes summary judgment: whether his performance was the real reason he was fired. The court cannot agree. A court that determines an employee has failed to establish a *prima facie* case of discrimination need not address his pretext argument, Peele v. Country Mut. Ins. Co., 288 F.3d 332, and Mr. Dunlap hasn't identified a similarly

situated co-worker outside of his protected class who was treated more favorable manner, so he cannot establish a *prima facie* case. Id at 331.

Even if Mr. Dunlap could show a *prima facie* case of discrimination, he could not survive summary judgment. To demonstrate a material issue of fact as to pretext, a plaintiff must show that either (1) that it is more likely that a discriminatory reason motivated the employer than the proffered non-discriminatory reason or (2) that an employer's explanation is not credible. Hudson v. Chicago Transit Authority, 375 F.3d 552, 561 (7th Cir. 2004). Pretext is more than a mistake on the part of the employer; it is a phony excuse. Debs v. Northeastern Illinois Univ., 153 F.3d 390, 395 (7th Cir.1998). Where a defendant has proffered more than one reason for the challenged action, a plaintiff must address all of the employer's suggested reasons. Id at 395. A court, however, doesn't "sit as a super-personnel department that reexamines an entity's business decisions." Dale v. Chicago Tribune Co., 797 F.2d 458, 464 (7th Cir.1986). It determines "whether the employer gave an honest explanation of its behavior." Id. (quoting Pollard v. Rea Magnet Wire Co., 824 F.2d 557, 560 (7th Cir.1987)).

The Sanitary District points to several legitimate reasons for the treatment of Mr. Dunlap: (1) he was a probationary employee, (2) hired for a newly created position, (3) who often missed work during his probationary period, and who (4) had numerous conflicts with co-workers and supervisors, (4) refused to follow the direct orders of his supervisors, (5) was openly hostile and defiant to his supervisors, (6) and was dishonest in the performance of his job. Mr. Dunlap

12

doesn't point to any evidence that refutes or suggests these reasons aren't credible. Instead he asks the court to review the business judgment of Mr. Kentzele and Mr. Walus, and to this extent, he must do more than rely on his personal estimates regarding his performance. <u>Dale v. Chicago Tribune Co.</u>, 797 F.2d 458, 464-465. Mr. Dunlap hasn't established a material issue of fact as to whether the reasons for his treatment are pretext for discrimination.

CONCLUSION

For the foregoing reasons, the defendant's motion for summary judgment [Docket No. 45] is GRANTED. The clerk shall enter judgment accordingly.

SO ORDERED.

Entered:  <u>June 19, 2006</u>

<u>    /s/ Robert L. Miller, Jr.    </u>
Chief Judge
United States District Court

cc: counsel of record
S. Dunlap

13